

In The

Court of Appeals

Seventh District of Texas at Amarillo

No. 07-21-00099-CV
No. 07-21-00101-CV

IN THE INTEREST OF E.C.R. AND K.F., CHILDREN
IN THE INTEREST OF B.L., A CHILD

On Appeal from the 316th District Court
Hutchinson County, Texas
Trial Court No. 43,640, Honorable James M. Mosley, Presiding

September 17, 2021

OPINION

Before PIRTLE and PARKER and DOSS, JJ.

In appellate cause numbers 07-21-00099-CV and 07-21-00101-CV, "Kim" appeals two final orders terminating her parental rights to three children, E.C.R., K.F., and B.L.[1] The appellee is the Texas Department of Family and Protective Services. The cases were consolidated for a bench trial. By her appeal, Kim raises two issues. In her first

---

[1] To protect the privacy of the parties, we will refer to the appellant mother as "Kim," the father of B.L. as "Conrad," and to the children by the initials "E.R.," "K.F.," and "B.L." *See* TEX. FAM. CODE. ANN. § 109.002(d); TEX. R. APP. P. 9.8(b). Conrad's parental rights were terminated in cause number 07-21-00101-CV, but he did not appeal. The parental rights of the fathers of E.R. and K.F. were terminated in cause number 07-21-00099-CV, but they did not appeal.

issue, Kim challenges the trial court's jurisdiction on the basis that the final hearing was not commenced before the statutory dismissal date set out in Family Code section 263.401. In her second issue, Kim challenges the sufficiency of the evidence to support the trial court's best interest finding. We affirm the judgment of termination in each case.

## Background

The trial court conducted a bench trial through Zoom videoconferencing on April 14, 2021.[2] The children the subject of this suit are thirteen-year-old E.R., three-year-old K.F., and eighteen-month-old B.L. Kim is the mother of these children. Conrad is the father of B.L.

The Department became involved with Kim, Conrad, E.R., and K.F. in September of 2018 after receiving a report alleging negligent supervision. There were also concerns of domestic violence between Kim and Conrad and drug use in the home. Kim admitted to the department investigator that she had recently used marijuana. During the investigation, Kim acknowledged that the police had been to the home concerning allegations of methamphetamine being manufactured in the home. After the Department obtained a court order for drug testing, Kim, Conrad, and eleven-month-old K.F. tested positive for amphetamine and methamphetamine.

In December of 2018, the Department removed E.R. and K.F. from Kim's care and filed its petition for protection, conservatorship, and termination of parental rights.

---

[2] In response to the threat presented by the COVID-19 pandemic, the Texas Supreme Court issued numerous emergency orders authorizing "anyone involved in any hearing . . . to participate remotely, such as by videoconferencing." See TEX. GOV'T CODE ANN. § 22.0035(b). One such order was effective as of the date of this hearing.

2

Following an adversary hearing, the Department was appointed temporary managing conservator of E.R. and K.F.

In June of 2019, the Department received another report alleging neglectful supervision by Kim and her newborn son, B.L. That report alleged that Kim was using methamphetamine during her pregnancy. Kim admitted to using methamphetamine in February, March, and April before B.L.'s birth, and drug testing confirmed her use of the controlled substance. The Department removed B.L. from Kim's care and filed its petition for protection, conservatorship, and termination of parental rights. Following an adversary hearing, the Department was appointed temporary managing conservator of B.L.

B.L. was placed in the same foster home as his sister, K.F.[3] E.R. was placed at the Children's Home in Amarillo.

The Department developed a family service plan for Kim in each case. The service plans set out several tasks and services for Kim to complete before reunification with E.R., K.F., and B.L. could occur. These tasks and services included the following: attend parenting classes; obtain and maintain stable housing that is appropriate and safe for the children; obtain and maintain income sufficient for her family's needs; maintain contact with the caseworker; submit to random drug screens; participate in a substance abuse assessment at Outreach, Screening, Assessment, and Referral (OSAR) and follow recommendations; complete a psychosocial assessment and follow recommendations; attend individual counseling; participate in and complete domestic violence education; complete a mental health assessment at Texas Panhandle Centers (TPC); and attend

---

[3] The foster parents intervened in both underlying cases. They have not filed an appellate brief.

3

visitation. Kim also agreed to complete in-patient substance abuse treatment as a part of her plan of service in B.L.'s case.

Kim completed some of her service plan requirements. She completed her individual counseling, an OSAR evaluation, and the OSAR recommendation that she attend in-patient substance abuse treatment. Kim completed parenting classes in October of 2020, and additional parenting classes addressing autism and ADHD for E.R. The caseworker questioned whether Kim was able to apply what she learned in these extra classes. Kim also completed a psychosocial evaluation and a second referral to domestic violence education classes. Kim did not obtain a mental health evaluation at TPC or follow through with recommendations for evaluation for bipolar and anxiety disorders.

The caseworker described Kim's visitation with the children as "sporadic" and inconsistent. She estimated that Kim attended less than half of the allowed visits. Kim was afforded both in-person and video visits. When Kim attended visits in person, she would show up late and make inappropriate comments to E.R. that left him frustrated and unable to "deregulate." E.R. would remain upset over his conversations with Kim for several days. The conversations Kim had with E.R. encouraged him to be rebellious and not comply with the rules at the Children's Home. When Kim canceled a visit on a Friday or Saturday morning, E.R. would be upset the entire weekend. In February of 2021, the trial court suspended Kim's visits with E.R. at the request of E.R.'s caseworker and on the recommendation of E.R.'s counselor.

Kim claimed that a lack of transportation hindered her visits with the children. She has been without a vehicle for three to four months. Kim testified that it is difficult to engage with the younger children on video chats and that some of those visits were cut short at E.R.'s request.

At the time of trial, Kim was unemployed but had income from the sale of property. If she can obtain transportation, she plans to return to work at JBS, a local meat-packing plant. Kim worked at JBS for approximately six months beginning in November of 2019. In August of 2020, Kim told her caseworker that she was going to work at a Little Caesars pizza restaurant, but she did not provide any proof of her employment there.

Kim admitted to using marijuana and methamphetamine in 2018, and to using methamphetamine in 2019 before B.L. was born. In August of 2019, Kim attended a thirty-day in-patient drug rehabilitation program at Serenity House in Plainview. After her discharge, Kim tested negative on several random drug screens between September 2019 and March 2020. In April of 2020, Kim submitted to a drug test but the sample she provided was "cold" and could not be tested. Kim did not submit to a drug test in May. In June, Kim's hair follicle drug test was positive for methamphetamine. When asked if she submitted to drug testing in July of 2020, she responded that, "if I didn't, I was probably at work." Kim had a negative drug test in September, which was the last test that she took before trial. She did not submit to drug testing in October, November, or December of 2020, or in March of 2021. The failure to submit to drug testing is considered a positive drug test result under her service plan.

5

Kim was diagnosed with asthma in April of 2020. She was prescribed Symbicort and used an Equate inhaler. Kim stopped using the inhaler in June after she tested positive for methamphetamine on a hair follicle drug test requested by the Department. Kim attributes that positive result to using her inhaler and disputes the validity of the positive test, contending that she was not using methamphetamine. Dr. Jimmie Valentine testified that it is possible that the inhaler caused a false positive, but he "can't say with certainty."

Kim requested that the court return her children to her. She has resided in the same three-bedroom apartment since the Department became involved in 2018. According to Kim, the children's rooms are furnished with new clothes and furniture. The caseworker conceded that Kim's residence was appropriately furnished when she last inspected it in November of 2020. The caseworker did not have regular contact with Kim after November because Kim ceased communicating and cooperating with the Department. The caseworker testified that she was not allowed inside Kim's apartment when she attempted a home visit in February of 2021.

E.R. is currently placed at the Children's Home in Amarillo. He is doing well in his current placement and the placement meets all his needs. E.R. has been diagnosed with autism and functions at the level of a seven- to nine-year-old boy. The group home setting at the Children's Home helps to alleviate some of E.R.'s disruptive behaviors. He is able to meet with his counselor regularly. E.R. attends Austin Middle School. He is doing "fair" in school, and he is involved with the band program. E.R. has "thrived and he has blossomed since the visits [with Kim] have been discontinued." E.R. has previously expressed to his counselor that he would like to return to his home with Kim, but he also

6

recently expressed an interest in moving to a foster home. According to his counselor, it is not in E.R.'s best interest to return to Kim because E.R. is unable to assess his own safety and well-being and he struggles with basic social skills. Kim has not demonstrated an ability to provide E.R. the structure, boundaries, and instruction that he needs. The caseworker stated that E.R. is a good candidate for adoption and there is a "strong possibility" that he would be adopted. The Department's permanency goal for E.R. is "unrelated adoption, unrelated conservatorship."

The two youngest children, K.F. and B.L., are currently placed together with a foster family in Pampa, Texas. The foster family provides a safe and stable home environment and is diligent in taking care of the needs of K.F. and B.L. The children are taken to all their required medical appointments. The children are bonded with their foster family and the family would like to be a permanent placement for both children and to ultimately adopt them.

The trial court terminated Kim's parental rights on the grounds set forth in Texas Family Code section 161.001(b)(1)(D), (E), (N), (O), and (P). *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E), (N), (O), and (P).[4] The trial court further found termination of Kim's parental rights was in the best interest of E.R., K.F., and B.L. *See* § 161.001(b)(2). The trial court appointed the Department as the managing conservator of all three children.

---

[4] Further references to provisions of the Texas Family Code will be by reference to "section __" or "§ __."

A parent's right to the "companionship, care, custody, and management" of his or her child is a constitutional interest "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758-59, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982); *see In re M.S.,* 115 S.W.3d 534, 547 (Tex. 2003). Consequently, we strictly scrutinize termination proceedings and strictly construe the involuntary termination statutes in favor of the parent. *Holick v. Smith,* 685 S.W.2d 18, 20 (Tex. 1985). However, "the rights of natural parents are not absolute" and "[t]he rights of parenthood are accorded only to those fit to accept the accompanying responsibilities." *In re A.V.,* 113 S.W.3d 355, 361 (Tex. 2003) (citing *In re J.W.T.*, 872 S.W.2d 189, 195 (Tex. 1993)). Recognizing that a parent may forfeit his or her parental rights by his or her acts or omissions, the primary focus of a termination suit is protection of the child's best interests. *See id.*

In a case to terminate parental rights under section 161.001 of the Family Code, the petitioner must establish, by clear and convincing evidence, that (1) the parent committed one or more of the enumerated acts or omissions justifying termination, and (2) termination is in the best interest of the child. § 161.001(b). Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." § 101.007; *In re J.F.C.,* 96 S.W.3d 256, 264 (Tex. 2002). Both elements must be established and termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re K.C.B.,* 280 S.W.3d 888, 894 (Tex. App.—Amarillo 2009, pet. denied). "Only one predicate finding under section 161.001[(b)](1) is necessary to support a

judgment of termination when there is also a finding that termination is in the child's best interest." *In re A.V.,* 113 S.W.3d at 362. We will affirm the termination order if the evidence is both legally and factually sufficient to support any alleged statutory ground the trial court relied upon in terminating the parental rights if the evidence also establishes that termination is in the child's best interest. *In re K.C.B.*, 280 S.W.3d at 894-95.

The clear and convincing evidence standard does not mean the evidence must negate all reasonable doubt or that the evidence must be uncontroverted. *In re R.D.S.*, 902 S.W.2d 714, 716 (Tex. App.—Amarillo 1995, no writ). The reviewing court must recall that the trier of fact has the authority to weigh the evidence, draw reasonable inferences therefrom, and choose between conflicting inferences. *Id.* The factfinder also enjoys the right to resolve credibility issues and conflicts within the evidence and may freely choose to believe all, part, or none of the testimony espoused by any particular witness. *Id.* Where conflicting evidence is present, the factfinder's determination on such matters is generally regarded as conclusive. *In re B.R.*, 950 S.W.2d 113, 121 (Tex. App.—El Paso 1997, no writ).

The appellate court cannot weigh witness credibility issues that depend on demeanor and appearance as the witnesses are not present. *In re J.P.B.,* 180 S.W.3d 570, 573 (Tex. 2005). Even when credibility issues are reflected in the written transcript, the appellate court must defer to the factfinder's determinations, as long as those determinations are not themselves unreasonable. *Id.*

Standard of Review

When reviewing the legal sufficiency of the evidence in a termination case, the appellate court should look at all the evidence in the light most favorable to the trial court's finding "to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.F.C.,* 96 S.W.3d at 266. To give appropriate deference to the factfinder's conclusions, we must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved or found to have been not credible, but we do not disregard undisputed facts. *Id.* Even evidence that does more than raise surmise or suspicion is not sufficient unless that evidence is capable of producing a firm belief or conviction that the allegation is true. *In re K.M.L.,* 443 S.W.3d 101, 113 (Tex. 2014). If, after conducting a legal sufficiency review, we determine that no reasonable factfinder could have formed a firm belief or conviction that the matter that must be proven was true, then the evidence is legally insufficient and we must reverse. *Id.* (citing *In re J.F.C.,* 96 S.W.3d at 266).

In a factual sufficiency review, we must give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing. *In re J.F.C.,* 96 S.W.3d at 266. We must determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the petitioner's allegations. *Id.* We must also consider whether disputed evidence is such that a reasonable factfinder could not have resolved the disputed evidence in favor of its finding. *Id.* If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited

in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient. *Id.*

Statutory Dismissal Deadline Under Section 263.401

In cases where the Department requests termination of parental rights or conservatorship of a child, the Family Code requires the court to begin trial within one year of appointing the Department as temporary managing conservator. § 263.401(a). The trial court may extend the deadline once for 180 days upon a finding of "extraordinary circumstances." § 263.401(b). If the trial court grants an extension under subsection (b) but fails to commence the trial on the merits before the dismissal date, "the court's jurisdiction over the suit is terminated and the suit is automatically dismissed without a court order. The court may not grant an additional extension that extends the suit beyond the required date for dismissal under Subsection (b) . . . ." § 263.401(c).

Through her first issue, Kim challenges the second extension of the dismissal date in E.R. and K.F.'s case and argues the trial court lost jurisdiction because it failed to render a final order or commence the final hearing by June 15, 2020, the statutory dismissal date prescribed by section 263.401(b).

Procedural History

On December 13, 2018, the trial court entered an order of protection and named the Department temporary managing conservator of E.R. and K.F., and a dismissal date was set. Under section 263.401, the initial dismissal date was calculated to be December 16, 2019. § 263.401(a) (original dismissal date is "the first Monday after the first

anniversary of the date the court rendered a temporary order appointing the [D]epartment as temporary managing conservator. . . .").

At the permanency hearing on August 27, 2019, the trial court found extraordinary circumstances necessitated that E.R. and K.F. remain in the temporary managing conservatorship of the Department and that continuing the appointment of the Department as temporary managing conservator was in the children's best interest. As a result, the trial court granted a 180-day extension pursuant to section 263.401(b) and reset the dismissal date for June 15, 2020. A final hearing was subsequently set for June 11.

At the time of the hearing on June 11, Texas courts were subject to emergency orders issued by the Supreme Court of Texas due to the COVID-19 pandemic. As a result, the Department sought another extension and requested the trial court to suspend section 263.401's dismissal date pursuant to the court's standing order,[5] extend the dismissal date to December 11, and reset the final hearing to August 6. The trial court granted the Department's request and orally rendered the following order:

> [P]ursuant to [the court's] standing order and the Supreme Court's Twelfth Emergency Order regarding the State of Disaster issued by the Supreme Court [on] April 27th, 2020, the [c]ourt does extend those deadlines in both of these cases until 30 days after the State of Emergency is lifted.[6]

---

[5] The trial court's standing order was not included in the appellate record.

[6] The Twelfth Emergency Order allowed a Texas court to "[m]odify or suspend any and all deadlines and procedures . . . specifically including those in Section 263.401 of the Family Code . . . for a stated period ending no later than 30 days after the Governor's state of disaster has been lifted." *In re Twelfth Emergency Order Regarding the COVID-19 State of Disaster,* No. 20-9059, 2020 Tex. LEXIS 1020, at *1-2 (Tex. Apr. 27, 2020). The Seventeenth Emergency Order had superseded the Twelfth Emergency Order when the hearing was held on June 11. As relevant here, that order provided: "[A]ll courts in Texas may in any case, civil or criminal[,] . . . without a participant's consent: . . . (ii) extend the dismissal date for any case previously retained on the court's docket for an additional period not to exceed 180 days from the date

12

After the above recitation, the trial court conducted a permanency hearing. The trial court signed the permanency hearing order on August 4, resetting the final hearing for August 6, and extending the dismissal date to December 11. In its written order, the court extended the dismissal date according to section 263.401(b) but it did not reference the applicable Supreme Court emergency order.

Analysis

Kim contends the trial court lost jurisdiction when it "again found extraordinary circumstances warranted retaining the case" and setting a new dismissal date for another 180 days and asserts that "a potential argument that the further extension of the case was necessary due to the Covid-19 pandemic [is] invalid" because the trial court stated that the second extension was based on section 263.401(b). We disagree with Kim's assertions and hold the trial court properly extended the dismissal date.

In the absence of an extension, the automatic statutory deadline for the court to commence the trial on the merits was June 15, 2020. *See* § 263.401(c). The record shows that at the June 11 proceedings, the trial court orally pronounced its extension and properly extended and retained the case based on the Twelfth Emergency Order and the court's standing order. *See* § 101.026 (pronouncement may be made orally in the presence of the court reporter or in writing, "including on the court's docket sheet or by a separate written instrument"); *Phillips v. Tex. Dep't of Protective and Regulatory Servs.,*

---

of this Order." *Seventeenth Emergency Order Regarding the COVID-19 State of Disaster*, 609 S.W.3d 119, 120 (Tex. May 26, 2020). This order "renewed" paragraph 3 of the Twelfth Emergency Order and allowed courts to extend the dismissal date "for any case previously retained on the court's docket for an additional period not to exceed 180 days from the date of this Order." *Id.*

149 S.W.3d 814, 817 (Tex. App.—Eastland 2004, no pet.) (section 263.401(b) does not require a written order; an oral rendition is sufficient). The Twelfth Emergency Order specifically allowed the court to "modify or suspend" the deadlines and procedures in section 263.401. As a result, the automatic dismissal provisions of section 263.401(c) were suspended and the trial court was authorized to extend the dismissal deadline for another 180 days. *See E.N. v. Tex. Dep't of Family & Protective Servs.,* No. 03-21-00014-CV, 2021 Tex. App. LEXIS 4831 (Tex. App.—Austin June 17, 2021, no pet. h.) (mem. op.) (discussing section 263.401 and Supreme Court's emergency order relating to COVID-19 state of disaster and stating "[t]his would theoretically have allowed the district court to extend the case indefinitely by granting an extension under each successive order" and noting that, "[o]nce the authorizations stopped, each of the cases where a court had granted an extension would have to be tried before the automatic dismissal date"). As such, section 263.401(b) remained operative as a basis to extend the dismissal date, as recited in the trial court's August 4 order. Moreover, the trial court's order granting an extension contained the findings required by section 263.401(b). *In re G.X.H.,* No. 19-0959, 2021 Tex. LEXIS 345, at *20 (Tex. Apr. 30, 2021).

We conclude the trial court properly extended its jurisdiction when it orally rendered its pronouncement on June 11, before the dismissal deadline of June 15. We further conclude the trial court had jurisdiction when the case was tried on April 14, 2021, as the trial court entered a subsequent order extending the dismissal date to May 10, 2021,

14

pursuant to the Twenty-Ninth Emergency Order.[7]  *See Twenty-Ninth Emergency Order Regarding COVID-19 State of Disaster,* No. 20-9135, 2020 Tex. LEXIS 1177, at *2 (Tex. Nov. 11, 2020) ("(ii) for any case previously retained on the court's docket pursuant to Section 263.401(b) or (b-1), or for any case whose dismissal date was previously modified under an Emergency Order of this Court related to COVID-19, [courts may] extend the dismissal for an additional period not to exceed 180 days from the date of this Order . . . ."). We overrule Kim's issue.

## Best Interest

In her remaining issue, Kim challenges the factual and legal sufficiency of the evidence to support the best interest finding made under section 161.001(b)(2) in each case. Kim does not contest the predicate grounds for termination under section 161.001(b)(1).

A determination of best interest necessitates a focus on the child, not the parent. *In re B.C.S.,* 479 S.W.3d 918, 927 (Tex. App.—El Paso 2015, no pet.). Appellate courts examine the entire record to decide what is in the best interest of the child. *In re E.C.R.,* 402 S.W.3d 239, 250 (Tex. 2013). There is a strong presumption that it is in the child's best interest to preserve the parent-child relationship. *In re R.R.,* 209 S.W.3d 112, 116 (Tex. 2006).

---

[7] On November 19, the trial court signed an order suspending the dismissal date and retaining suit on court's docket, and an order resetting final hearing pursuant to the Twenty-Ninth Emergency Order. The trial court set the new dismissal date for May 10, 2021. The trial was held on April 14, 2021.

In assessing whether termination is in a child's best interest, the courts are guided by the non-exclusive list of factors in *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976). These factors include: (1) the desires of the child, (2) the emotional and physical needs of the child now and in the future, (3) the emotional and physical danger to the child now and in the future, (4) the parental abilities of the individuals seeking custody, (5) the programs available to assist these individuals to promote the best interest of the child, (6) the plans for the child by these individuals or by the agency seeking custody, (7) the stability of the home or proposed placement, (8) the acts or omissions of the parent that may indicate that the existing parent-child relationship is not proper, and (9) any excuse for the acts or omissions of the parent. *Id.* "[T]he State need not prove all of the factors as a condition precedent to parental termination, 'particularly if the evidence were undisputed that the parental relationship endangered the safety of the child.'" *In re C.T.E.*, 95 S.W.3d 462, 466 (Tex. App.—Houston [1st Dist.] 2002, pet. denied) (quoting *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002)). Evidence that supports one or more statutory grounds for termination may also constitute evidence illustrating that termination is in the child's best interest. *See In re E.C.R.*, 402 S.W.3d at 249. The best interest analysis may consider circumstantial evidence, subjective factors, and the totality of the evidence as well as direct evidence. *In re N.R.T.,* 338 S.W.3d 667, 677 (Tex. App.—Amarillo 2011, no pet.). We must also bear in mind that a child's need for permanence through the establishment of a stable, permanent home has been recognized as the paramount consideration in determining best interest. *See In re K.C.,* 219 S.W.3d 924, 931 (Tex. App.—Dallas 2007, no pet.).

When the Department became involved with the family in the fall of 2018, Kim, Conrad, and K.F. tested positive for amphetamine and methamphetamine. Kim admitted to marijuana use the week before the Department's investigation began. After E.R. and K.F. were removed from Kim's care and placed in foster care, Kim continued to use methamphetamine while she was pregnant with B.L. After B.L. was born, Kim was not compliant with the random drug tests required under the service plan and failed to appear for multiple drug tests requested by the Department. Those failures are considered positive results under her service plan. A parent's refusal to submit to drug testing may be considered as evidence that she is continuing to abuse drugs. *In re T.R.L.,* No. 10-14-00290-CV, 2015 Tex. App. LEXIS 2178, at *14 (Tex. App.—Waco Mar. 5, 2015, no pet.) (mem. op.) ("A factfinder may reasonably infer from a parent's refusal to take a drug test that the parent was using drugs."); *In re C.R.,* 263 S.W.3d 368, 374 (Tex. App.—Dallas 2008, no pet.) (trial court could reasonably infer parent avoided taking drug tests because she was using drugs). A parent's drug use supports a finding that termination of parental rights is in the best interest of the child. *In re D.M.M.,* No. 14-16-00664-CV, 2017 Tex. App. LEXIS 47, at *13 (Tex. App.—Houston [14th Dist.] Jan. 5, 2017, pet. denied) (mem. op.).

Moreover, Kim acknowledged that her methamphetamine use in the home was a dangerous living environment for E.R. and K.F. and conceded that using methamphetamine while she was pregnant with B.L. was "definitely" dangerous. The trial court's unchallenged predicate grounds are probative in the best interest determination. *In re E.A.F.,* 424 S.W.3d 742, 750 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) (citing, *inter alia, In re C.H.,* 89 S.W.3d at 28). Here, Kim's parental rights were terminated

on the predicate grounds of endangering conditions, endangerment, constructive abandonment, failure to comply with a court order that established actions necessary to retain custody of the children, using a controlled substance in a manner that endangered the health or safety of the children, and abusing a controlled substance after completion of a court-ordered substance abuse treatment program. A parent's drug use demonstrates an inability to provide a stable environment for the children and an inability to provide for the children's emotional and physical needs. *In re E.M.,* 494 S.W.3d 209, 222-23 (Tex. App.—Waco 2015, pet. denied). The unchallenged statutory grounds for termination are significant in our review of the best interest finding.

Kim disputed the positive test result in June of 2020 contending she did not use methamphetamine at that time. We are not to "second-guess the trial court's resolution of a factual dispute by relying on evidence that is either disputed, or that the court could easily have rejected as not credible." *In re L.M.I.,* 119 S.W.3d 707, 712 (Tex. 2003). As factfinder and sole judge of the credibility and demeanor of witnesses, the trial court was free to credit positive test results over Kim's denial of methamphetamine use. *See In re S.R.,* 452 S.W.3d 351, 365 (Tex. App.—Houston [14th Dist.] 2014, pet. denied).

Although Kim's expert testified that the June 2020 hair follicle test could possibly be a false positive, the trial court could have believed that testimony was not credible. The trier of fact is the sole judge of the credibility of the witnesses and the weight to give their testimony. *Id.*

The Department also presented evidence that Kim did not consistently exercise her periods of possession with the children. Kim's visitation with the children was

18

described as "sporadic." In February, the trial court suspended Kim's visits with E.R. after E.R.'s counselor testified that Kim's visits were detrimental to E.R. A parent's lack of consistency and failure to engage in visitation indicates the parent would not meet the children's emotional and physical needs in the future.

Although the evidence showed that Kim completed some of the service plan's requirements, she did not comply with significant portions of her plan, including random drug testing, attending visitation, maintaining employment, and staying in contact with the Department. Kim successfully completed an in-patient drug rehabilitation program in September of 2019, but it had been more than six months since Kim had submitted to a drug test when the final hearing was held. Kim asserts that her housing is stable because she lives in the same three-bedroom apartment that she had when E.R. and K.F. were removed. However, her continued illegal drug use, her failure to comply with the Department's drug testing, her sporadic employment, and inconsistent visitation belies Kim's assertion that she can provide a stable living environment for the children.

The evidence also reflected that Kim had little understanding of E.R.'s needs as an autistic child and aspects of his care such as providing structure, boundaries, and instruction. Kim admitted that she made a decision to no longer cooperate with the Department after she learned they were seeking termination, and she ceased contact and participation in Department services in the fall of 2020. The factfinder can infer from a parent's failure to take the initiative to utilize the available programs that the parent did not have the ability to motivate herself in the future. *In re S.P.*, 509 S.W.3d 552, 558 (Tex. App.—El Paso 2016, no pet.). A trial court is permitted to consider a parent's drug use and failure to comply with a family plan of service in its best interest determination. *In re*

*S.B.,* 207 S.W.3d 877, 887-88 (Tex. App.—Fort Worth 2006, no pet.). This evidence weighs heavily in favor of the best interest finding.

Stability and permanence are paramount in the upbringing of children. *In re J.D.,* 436 S.W.3d 105, 120 (Tex. App.—Houston [14th Dist.] 2014, no pet.). The factfinder may compare the parent's and the Department's plans for the child and determine whether the plans and expectations of each party are realistic or weak and ill-defined. *Id.* at 119-20.

Here, Kim asked the trial court to return the children to her care or, alternatively, to keep the children's placements and allow her to have visitation. Kim did not articulate any clear plans for the children. In contrast, the Department's plan for the children was permanence. The trial court heard testimony from the caseworker that K.F. and B.L. are bonded with each other and with the foster parents. At the time of placement with the foster parents, K.F. was eleven months old and B.L. was five days old. They are doing well in the foster home and the foster family planned to adopt them. "When children are too young to express their desires, the factfinder may consider whether the children have bonded with the foster family, are well-cared for by them, and have spent minimal time with a parent." *In re S.R.,* 452 S.W.3d at 369.

At the time of trial, E.R. was thirteen years old, and he was settled into a structured environment. According to the caseworker, he is getting exceptional help with his autism, and he is learning to control his emotions. Moreover, E.R.'s behavior markedly improved after the visits with Kim were suspended. E.R. has expressed a desire to return to Kim's care, but more recently, he has requested to be transitioned to a foster care placement. The Department's plan for E.R. is adoption.

20

The trial court heard evidence that the children were thriving and well cared for in their respective placements. The Department's plan would provide permanence and stability for the children and weighs heavily in favor of the trial court's conclusion that termination of Kim's parental rights is in the best interest of the children.

We conclude the evidence is legally and factually sufficient to establish a firm conviction in the mind of the trial court that termination of Kim's parental rights is in the best interest of E.R., K.F., and B.L. We overrule Kim's issue challenging the best interest determination.

Conclusion

The judgment of the trial court terminating Kim's parental rights is affirmed.

Judy C. Parker
Justice